Jerry **CHARLES**, Plaintiff,

v.

Dick **VERHAGEN** and Jon Litscher, Defendants.

No. 01–C–253–C.

United States District Court, W.D. Wisconsin.

April 15, 2002.

See, also, 220 F. Supp.2d 955.

Jerry Charles, for Plaintiff.

Jody J. Schmelzer, Assistant Attorney General, Madison, WI, for Litscher, Jon Verhagen, Dick, Joshua Z. Rabinovitz, Washington, DC, for United States of America, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief brought pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–2000cc–5. Plaintiff Jerry Charles is a Wisconsin prisoner and practicing Muslim presently confined at the Oshkosh Correctional Institution in Oshkosh, Wisconsin. Defendant Dick Verhagen is the former administrator of the Wisconsin Department of Corrections Division of Adult Institutions. Defendant Jon Litscher is Secretary of the Department of Corrections. Plaintiff contends that defendants' enforcement of a prison Internal Management Procedure restricting his access to Islamic prayer oil and preventing him from celebrating more than one annual religious feast violates his rights under both the free exercise clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act.

Presently before the court are defendants' motion for summary judgment and plaintiff's motion for an enlargement of time in which to reply to defendants' motion and his motion for delay of judgment and appointment of counsel. I find that defendants violated plaintiff's rights under the Religious Land Use and Institutionalized Persons Act when they applied the challenged prison regulation to deny plaintiff's request to keep Islamic prayer oil in his cell. However, because defendants have challenged the act's constitutionality and the United States must be given the opportunity to intervene to defend the act, plaintiff will not be entitled to judgment on this claim until the question of the act's

constitutionality is resolved. In addition, I conclude that defendants are not liable for money damages on this claim because they are shielded by the doctrine of qualified immunity. I find also that defendants did not violate plaintiff's rights under the act in limiting plaintiff to one religious feast each year. Further, defendants are entitled to summary judgment on all of plaintiff's claims under the First Amendment's free exercise clause. Plaintiff's motions for an extension of time in which to respond to defendants' summary judgment motion and for delay of judgment under Fed.R.Civ.P. 56(f) will be denied. Finally, I will reserve a decision on plaintiff's motion for appointment of counsel.

An initial comment is necessary on plaintiff's response to defendants' proposed findings of fact. On February 26, 2002, plaintiff filed responses to defendants' motion for summary judgment that were not in compliance with this court's procedures to be followed on motions for summary judgment. In particular, when plaintiff disagreed with defendants' proposed facts and set forth his own factual assertions, he either failed to refer to evidence in the record supporting those assertions or cited unauthenticated photocopies of documents attached to his response. On February 27, 2002, Magistrate Judge Crocker issued an order in which he explained to plaintiff that he must support his proposed facts by citations to evidence in the record and that if he wanted to have his exhibits used as evidence, he would need to have them certified as true copies of the documents they purport to be. That could be accomplished either by·an affidavit of a person attesting to their validity or by a stipulation of counsel that the opposing party does not dispute the authenticity of the proposed document. *Charles v. Verhagen*, No. 01–C–253–C, dkt. # 55, at 2. Despite the looming trial date, plaintiff was granted an extension of time in which to bring his submissions into compliance with the court's rules.

Plaintiff has attempted to comply but his evidence is still deficient. In an effort to follow the magistrate's order, he has resubmitted his exhibits along with an affidavit in which he "attest[s] to the fact[ ] that all the exhibits are true and correct, that is [sic] attached to plaintiff['s] response to defendant[s'] proposed finding of facts and conclusion of law [sic]." Affid., dkt. # 57. However, the exhibits are primarily photocopied passages from unidentified books on Islam and a page from what appears to be a catalog from an unidentified institution offering degrees in Islamic studies. As defendants point out, plaintiff has not identified the book or books from which these passages originate. This necessarily undermines defendants' ability to reply to the factual assertions that plaintiff's exhibits are intended to support.

In other instances, plaintiff fails to cite any evidence at all, asserting instead that "[p]laintiff will like to note here that plaintiff attempts, to acquire the proper affidavits on these subject-matter has always been turn down." Plt.'s Resp. to Dfts.' Proposed Findings of Fact and Conclusions of Law, dkt. # 56, at ¶¶ 10, 11, 12. Plaintiff's affidavit does not suggest that the facts he alleges are based on personal knowledge. Accordingly, the bulk of defendants' proposed findings of fact must be considered undisputed. From the facts proposed by the parties, I find the following to be undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Plaintiff Jerry Charles is a Wisconsin inmate confined at the Oshkosh Correctional Institution in Oshkosh, Wisconsin. Defendant Dick Verhagen is the former administrator of the Wisconsin Depart-

ment of Corrections Division of Adult Institutions. Defendant Jon Litscher is Secretary of the Department of Corrections.

B. *Prayer Oil*

After an extensive review and comment period spanning five years, the Department of Corrections Division of Adult Institutions Religious Practices Steering Committee revised Internal Management Procedures 6 and 6A, relating respectively to religious beliefs and practices and religious property. Members of the committee in charge of the revisions met with and received input from numerous Department of Corrections staff and volunteers and members of various community religious groups. Committee members also met with Wisconsin Department of Justice officials and reviewed relevant legal precedents. The revised procedures were first implemented in April 2001.

Over the past 20 years, the inmate population overseen by the Department of Corrections has quadrupled without a corresponding increase in correctional institution staff. At the same time, the inmate population has become more difficult to manage, with more inmates facing lengthy or life sentences without possibility of parole. As a result, state corrections officials face greater security, administrative and financial pressures. One source of pressure is the effort to manage inmate property and property requests. In revising the religion internal management procedures, the Religious Practices Steering Committee sought to alleviate some of these pressures and to impose consistency with regard to religion regulations among the various state institutions.

Internal Management Procedure 6A permits inmates to keep in their cells approved religious property associated with their designated religious preference. Pursuant to procedure 6A, Islamic inmates may possess religious books and publications, prayer beads, a prayer rug and a kufi cap. Prayer oil is not an approved religious property item for Islamic inmates; accordingly, plaintiff is not allowed to keep prayer oil in his cell. The Religious Practices Steering Committee considers restrictions on inmate religious property necessary because of the innumerable religious property items inmates might request given the hundreds of different religions and religious sects practiced by Wisconsin inmates. With the increasing size of the prison population and the increased number of inmate transfers within the prison system, prison security, management and resource considerations have made it necessary to restrict the number of personal property items an inmate can possess, to limit the sources or vendors of items available to prisoners and to establish uniform property regulations. An unlimited number of religious and other property items would place an inordinate burden on staff when conducting searches and identifying particular items. It is not feasible to train staff to recognize every conceivable religious item with the limited resources available to the Department of Corrections. Therefore, the committee drew up limited lists of authorized property, after consulting with religious leaders, but left the Department of Corrections with some flexibility and discretion to address evolving areas.

An inmate who wants to procure a new item sets in motion the following procedures: (1) the inmate completes a form asking staff to approve the inmate's purchase of a particular property item; (2) a staff member reviews the request and approves or denies it, consistent with applicable regulations; (3) staff insures that the inmate has sufficient funds to pay for the item; (4) business office staff processes the approved form and issues a check to the vendor selling the item; (5) the order and check are mailed out through the mailroom; (6) the item is received by mailroom

staff; (7) the property item is inspected to insure that it does not contain contraband; (8) the item is inspected to see whether it meets allowable property specifications such as size, features and color; (9) if the property is not allowed, it must be held until the inmate has an opportunity to file an inmate complaint; (10) if the item is not allowed or is unacceptable to the inmate, it has to be repackaged and returned to the vendor for a refund; (11) if the vendor accepts the return, the refund check must be processed and deposited in the inmate's account; (12) if the item is allowed, it must be added by staff to the inmate's property inventory; (13) the item must be transported to the inmate's housing unit and unit staff must make a record of the addition to the inmate's property inventory; (14) if the new property item puts the inmate over the total allowable property limit, a current item of inmate property must be removed from the inmate's property inventory and packed up for mailing out of the institution or stored until it can be sent out with a visitor; (15) if an inmate is released or transferred, each item of property must be inventoried and packed to insure the item belongs to the inmate and is not broken; and (16) if the inmate is transferred, the property must be unpacked and re-inventoried at the new institution to insure that nothing has been lost or broken.

Security necessitates searching and monitoring inmate property regularly. Property-related security concerns include the prevention of theft and bartering; preventing inmate misuse of property by, for example, fashioning weapons; insuring that property is not utilized to signify gang affiliation or to hide contraband; and avoiding unauthorized transfer of property items as the result of strong-arming or to pay off gambling or other debts. The security need to search inmate cells regularly is fundamental in a prison. The more property items inmates are allowed, the more difficult and time consuming these searches become. Health and safety concerns play a part as well, because of the possibility that cluttered cells will lead to fire hazards or friction between roommates. In revising Internal Management Procedure 6A, the committee considered these Department of Corrections interests in drafting the current limitation on inmate property, including religious property. The committee considered the need for uniformity to preserve fairness among religious faiths, knowing that some faiths utilize very few property items in their practice while others utilize multiple items.

### C. Religious Feasts

For purposes of Department of Corrections' policies, a "feast" means a religious observance that customarily involves a meal. Revised Internal Management Procedure 6, dealing with religious beliefs and practices, allows one religious feast each year for each "umbrella religion group." An umbrella religion group is "[a]n inclusive group designed to appeal to a wide range of religious beliefs within a given faith group." Islam is an umbrella religion group under the internal management procedure. The other umbrella groups are Protestant, Native American, Catholic, Jewish, Buddhist and Wiccan.

Any gathering of inmates implicates security concerns. In addition, religious feasts entail additional workload for food service staff. Typically, food for religious feasts is served separately from the regular meal service and not in the usual dining area. The staff must make the arrangements for the feast, distribute notices of which inmates are allowed to attend, screen and process outside religious visitors and provide additional security staff to supervise the group gathering. Because some religions have numerous feasts each year, prison resources would be taxed if each religion were allowed to have as

many feasts as its adherents request each year. In revising Internal Management Procedure 6 to restrict religious feasts to one each year, the Religious Practices Steering Committee considered these security, management and resource issues. The committee considered several other factors as well, including the Department of Corrections' historic problems with occasional gang efforts to take over religious groups in order to use the groups as cover for gang activity; the propensity of some inmates to perceive religious feasts as a sign of favoritism towards particular groups of inmates, leading to animosity and possible violence; "religion shopping" by some inmates so they could attend various religious meals; and a "near disturbance" at Oshkosh Correctional Institution during a religious feast when certain requested foods were not provided.

Although inmate co-religionists may eat together only once a year to celebrate a religious feast, they are not prevented from celebrating their religious feasts and beliefs through a special congregate service; a religious dietary request; individual study; personal meditation or religious observance in their cells; utilization of religious books and property; correspondence with fellow believers; pastoral visits; obtaining additional foods that meet religious dietary requirements through purchase in the institution canteen or approved donations; and asking to abstain from work or other program activities.

## OPINION

Defendants argue that their motion for summary judgment on plaintiff's claims under section three of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc–1, should be granted because that section of the act is unconstitutional; that even if section three of the act were constitutional, defendants are entitled to summary judgment because the prison regulations at issue pass muster under the standard of review established by the act; that they are entitled to summary judgment on plaintiff's First Amendment claims because the challenged regulations are reasonably related to legitimate penological interests; and that defendants are immune from plaintiff's monetary damage claims.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Religious Land Use and Institutionalized Persons Act

In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court "held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores*, 521 U.S. 507, 514, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In "direct response to the Court's decision" in *Smith*, Congress enacted the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to bb–4, in an effort "to rescind *Smith* and restore what proponents refer to as the pre-*Smith* standard: the 'compelling interest/least restrictive means' test" in cases challenging neutral, generally applicable laws that impinge on religious practices. *C.L.U.B. v. City of Chicago*, 157 F.Supp.2d 903, 917 (N.D.Ill.2001) (citations omitted). In *City of Boerne*, 521 U.S. at 536, 117 S.Ct. 2157, the Court invalidated the Religious Free-

dom Restoration Act, at least as it applied to the states, holding that in enacting the act Congress had exceeded its powers under the Fourteenth Amendment's enforcement clause. In September 2000, Congress responded with the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to cc–5, a narrower statute aimed specifically at alleviating burdens on religious liberty in the context of land use regulations and in institutional settings such as prisons.

It bears noting at the outset that the Religious Land Use and Institutionalized Persons Act requires courts to apply the same heightened scrutiny (the compelling interest/least restrictive means analysis) to prison regulations burdening the exercise of religion that its predecessor, the Religious Freedom Restoration Act, applied more broadly to all government regulations. Some commentators have argued that the Religious Freedom Restoration Act was "the most important congressional action with respect to religion since the First Congress proposed the First Amendment." Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L.Rev. 209, 243 (1994) ("RFRA is not a mere technical change from *Smith*. Rather, it restores a fundamentally different vision of human liberty."). It is significant, given the Supreme Court's holding in *Smith* that generally applicable laws effecting religious practices need not be justified by compelling interests to pass muster under the free exercise clause, that the Religious Land Use and Institutionalized Persons Act affords prisoners engaged in religious conduct federal statutory protections above and beyond those embodied in the First Amendment. *See* Gregory S. Walston, *Federalism and Federal Spending: Why the Religious Land Use and Institutionalized Persons Act of 2000 is Unconstitutional*, 23 U. Haw. L.Rev. 479, 480 (2001) ("Remarkably, RLUIPA confers greater religious rights on inmates than on free citizens."). The act is to be construed broadly to favor the protection of inmates' religious exercise. 42 U.S.C. § 2000cc–3(g).

The Religious Land Use and Institutionalized Persons Act prohibits governmental imposition of a "substantial burden on the religious exercise" of a prisoner, unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1. The rule applies in any case in which—

(1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

(2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

In enacting a narrower statute and invoking its spending and commerce clause powers, Congress sought to address the concerns raised by the Supreme Court in *City of Boerne* without jettisoning the compelling interest/least restrictive means test. *See* 146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) ("[T]he bill applies only to the extent that Congress has power to regulate under the Commerce Clause, the Spending Clause, or Section 5 of the Fourteenth Amendment.").

Defendants concede that "because the Wisconsin DOC accepts federal funding, on its face, RLUIPA is applicable to plaintiff's claims." Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 15. However, defendants do not concede that the act is a valid exercise of Congress's spending powers and they challenge the act's validity on a variety of other constitutional grounds. Nevertheless, "federal judges [are] to ex-

plore all non-constitutional grounds of decision before addressing constitutional ones." *United States v. Bloom,* 149 F.3d 649, 653 (7th Cir.1998); *Kelly v. Illinois Bell Telephone Co.,* 325 F.2d 148, 151 (7th Cir.1963) ("Questions of constitutionality are not to be decided unless such adjudication is unavoidable."). Accordingly, I must determine first whether defendants can prevail on their summary judgment motion because, as they have argued, the prison regulations at issue pass muster under the standard of review established by the act. Under the act, plaintiff must first establish that the challenged regulations create a substantial burden on the exercise of his religious beliefs. If he succeeds, the burden then shifts to the defendants, who must demonstrate that the regulations (1) further a compelling state interest (2) by the least restrictive means. *See Murphy v. Zoning Comm'n of the Town of Milford,* 148 F.Supp.2d 173, 187 (D.Conn.2001).

1. *Religious feast limits*

■ Internal Management Procedure 6, which took effect on April 17, 2001, seeks to establish uniform guidelines relating to inmate belief and practice. The procedure regulates a variety of inmate religious practices, including participation in religious study groups, congregate services and pastoral visits. It also governs religious feasts and provides that

> [i]f required by [a] religion, one religious feast may be provided each year for each Umbrella Religion Group that has congregate services or a study group, based on the number of adherents, space availability, staff resources and security needs. Inmates may be approved to participate consistent with their designated religious preference only.

The procedure defines "umbrella religion group" as

> [a]n inclusive group designed to appeal to a wide range of religious beliefs within a given faith group. e.g. Protestant,

Islam, Native American, Catholic, Jewish, Buddhist, Wiccan, etc. Example: A Protestant umbrella group would meet the needs of all Protestant denominations such as Lutheran, Baptist, Methodist, Presbyterian, etc.

Plaintiff contends that defendants' enforcement of a prison regulation preventing him from celebrating more than one annual religious feast violates his rights under the act because Islam has two recognized religious feasts each year.

a. Substantial burden

The Religious Land Use and Institutionalized Persons Act is a statute of relatively recent vintage. There is little precedent interpreting its key terms. However, as defendants note, its predecessor, the Religious Freedom Restoration Act, had the same requirement that plaintiffs had to demonstrate a "substantial burden" on their exercise of religion before defendants were called upon to show a compelling interest furthered by the least restrictive means available. In *Mack v. O'Leary,* 80 F.3d 1175 (7th Cir.1996), *judgment vacated and remanded by O'Leary v. Mack,* 522 U.S. 801, 118 S.Ct. 36, 139 L.Ed.2d 5 (1997), the Court of Appeals for the Seventh Circuit elaborated on what the Religious Freedom Restoration Act meant by "substantially burdening" a person's exercise of religion. Although the court of appeal's decision in that case was vacated after the Supreme Court invalidated the RFRA as it applied to the states in *City of Boerne,* the court of appeals reasoning in *Mack* is instructive nonetheless.

In *Mack,* 80 F.3d at 1179, the court of appeals held that

> a substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that

manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.

The court of appeals went on to note that "[t]he proper and feasible question for the court is simply whether the practices in question are important to the votaries of the religion." *Id.* at 1180. In endowing the term "substantial burden" with a "generous definition" that is "sensitive to religious feeling," the court of appeals recognized the need to avoid a more rigorous analysis into the mandatory or non-mandatory quality of a religious practice that would make "judges arbiters of religious law." *Id.* at 1179. This reasoning is sensible. It conforms to both the Supreme Court's opinion in *Smith*, 494 U.S. at 887, 110 S.Ct. 1595 ("[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"), and the text of the Religious Land Use and Institutionalized Persons Act, which defines the term "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

Defendants acknowledge that "each year Muslims observe the completion of Ramadan and the completion of the Hajj" and that "many Muslims do celebrate these events with a meal." Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 40. However, defendants contend that neither of these "festivals" necessarily involves a meal, that the occasions "are more about celebration than eating" and that "[w]hat is most important are the prayers that are offered after the completion of Ramadan and the completion of the Hajj." Defendants note also that inmates are not prevented from celebrating their religious beliefs through various other means, such as attending special congregate services, submitting religious dietary requests or engaging in individual study and prayer. *Id.* at 40–41. Accordingly, defendants argue, the religious feast regulation "does not cause the plaintiff to refrain from celebrating Islamic events [or] inhibit or constrain the religious celebration or prayers that manifest a central tenet of the Muslim faith-it just prevents the 'eating' aspect of these festivals." *Id.* at 41. Defendants' arguments are derived from the affidavit and report of Ronald Beyah, a staff Chaplain at Dodge Correctional Institution, who is a spiritual leader ("Imam") in the Islamic faith. Affid. of Ronald Beyah, dkt. # 45, at Ex. E.

In response, plaintiff argues that "Islam has [had] two recognized feasts for over 1,400 years and now defendants are attempting to distort this fact." Plt.'s Resp. to Dfts.' Proposed Finding of Fact and Conclusions of Law, dkt. # 56, at 3. Plaintiff argues that "these feasts are practiced by all Muslims world wide" and, in reference to Mr. Beyah, that "Islam has had enough of ill-prepared Muslims in Islamic Jurisprudence passing verdicts that they are not qualified to be doing." *Id.* at 5. As noted at the outset of this opinion, plaintiff's proposed findings of fact are not in compliance with this court's procedures to be followed on motions for summary judgment because they cite only unauthenticated exhibits that appear to be excerpts from unidentified books on Islam. Because of this, defendants urge the court to ignore plaintiff's factual assertions. However, in *Mack*, 80 F.3d at 1179, the court of appeals noted that

[a] court should be able to figure out, usually from its own observations ('common knowledge') but if need be from evidence, which religious practices are important to their practitioners and which are not without having to determine who in the religion is authorized to

lay down dogma and what the content of that dogma is.

Accordingly, the fact that plaintiff's proposed factual findings do not properly cite evidence in the record is not fatal to his effort to establish that the religious feast regulation imposes a substantial burden on his ability to practice his religion.

Indeed, even defendants acknowledge that many Muslims celebrate both the completion of Ramadan and the Hajj with a meal or "feast." They do not question the sincerity of plaintiff's religious beliefs. The dispute between plaintiff and defendants, then, is over the relative significance for Muslims of a communal meal to celebrate the completion of both Ramadan and the Hajj. Over plaintiff's objections, defendants ask the court to find on the basis of an affidavit from a single Islamic spiritual leader employed by the Department of Corrections that "[a]ccording to Islam" festivals celebrating the completion of Ramadan and the Hajj "are more about celebration than eating" and that "[w]hat is most important are the prayers that are offered after the completion of Ramadan and the completion of the Hajj." This is precisely the type of dispute that courts should avoid refereeing. *See Smith*, 494 U.S. at 887, 110 S.Ct. 1595 ("What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith?"). Although I recognize that even under *Mack*, courts are called upon to "separate center from periphery in religious observances," 80 F.3d at 1179, I am convinced that plaintiff's desire to celebrate both the completion of Ramadan and the Hajj with a communal meal each year is important to his faith and that the prison regulation limiting religious feasts to one each year forces plaintiff "to refrain from religiously motivated conduct." *Id.* Accordingly, I find that the regulation imposes a substantial burden on the exercise of plaintiff's religion.

b. Compelling interest / least restrictive means

Because plaintiff has demonstrated successfully that the religious feast regulation imposes a substantial burden on his exercise of religion, the burden shifts to defendants to demonstrate that the regulation is designed to further a compelling government interest and is the least restrictive means of furthering that interest. 42 U.S.C. §§ 2000cc–1(a)(1), (2). Defendants argue that any gathering of inmates implicates fundamental security and resource concerns. They note the numerous arrangements that religious feasts entail. Defendants maintain that these DOC security, management, and resource concerns are all compelling and legitimate and that the policy of allowing the celebration of one religious feast through observance of a meal, along with other options for celebrating any other religious festivals or celebrations, is the least restrictive means of furthering those interests.

Defendants' position is persuasive. In *Mack*, 80 F.3d at 1180–81, the court of appeals considered a nearly identical inmate claim under the Religious Freedom Restoration Act. In that case, the inmate belonged to the Moorish Science Temple of America, whose adherents ("Moors") celebrate the birthday of their sect's founder with a "Prophet's Day" banquet. The Moors at the prison sought permission to hold such a banquet. Their request was denied. Instead, prison officials grouped the more than 300 religious denominations represented at the prison into four umbrella categories (Catholic, Jewish, Muslim and Protestant) and each was allowed one or two "picnic days" each year that they could use to celebrate a religious feast. No individual denomination was allowed its own picnic day. Prison officials reasoned that it would be "utterly impractical to allow each of 300 denominations to have its own

feast day." *Id.* at 1178. Although the court of appeals found that the plaintiff's religious practice was substantially burdened by the prison regulation, it observed that "undoubtedly a large fraction of [the religious denominations represented at the prison] could make a persuasive case that a periodic communal meal of some sort is a rite of their religion." However, the court found that the prison "cannot sponsor 300 banquets a year, or even 100. Its grouping of the denominations into four umbrella groups for purposes of festal occasions is all that the law could reasonably be thought to require of so religiously heterogeneous a prison." *Id.* at 1181. Accordingly, the court of appeals held that "defendants overcame the prima facie case thus made out by establishing both a compelling governmental interest in imposing the modest burden and the absence of any less restrictive alternative." *Id.* at 1180.

The prison regulation at issue in this case is strikingly similar to the one considered by the court of appeals in *Mack*. Under Internal Management Procedure 6, prisoners are divided into "Umbrella Religion Groups," such as Protestant, Islam, Native American, Catholic, Jewish, Buddhist and Wiccan. Each umbrella group that has congregate services or a study group is entitled to one religious feast a year. As a practicing Muslim, plaintiff falls within the Islam umbrella group and accordingly is entitled to celebrate one religious feast annually. Although plaintiff would like to celebrate two religious feasts each year, I am convinced that defendants' asserted security and resource concerns constitute a compelling interest justifying the religious feast regulation, as applied to plaintiff, and that it is the least restrictive means available to defendants. There is little doubt that "the interest in maintaining order in prisons is a compelling governmental interest," *Mack*, 80 F.3d at 1180; *Jones v. Roth*, 950 F.Supp. 254, 257 (N.D.Ill.1996). In *Mack*, the court of appeals recognized as compelling the interest in avoiding the enormous burden on prison resources entailed by allowing every religious denomination to celebrate each of its festal occasions. Moreover, the court viewed the "grouping of the denominations into four umbrella groups for purposes of festal occasions" as the least restrictive means for furthering the state's interest in conserving scarce prison resources. *Id.* at 1181. Plaintiff argues that defendants have exaggerated their security and resource concerns, but he has failed to support these allegations with citation to proper evidentiary material in the record. Accordingly, defendants' summary judgment motion will be granted on plaintiff's claim that defendants violated the Religious Land Use and Institutionalized Persons Act by preventing him from celebrating more than one religious feast each year.

### 2. *Prayer oil*

█ Department of Corrections Internal Management Procedure 6A governs inmate religious property. For each umbrella religion group, the regulation lists religious items that may be possessed by prisoners in their cells. Prisoners in the Islamic umbrella group may possess religious books and publications, prayer beads, a prayer rug and a kufi cap. They may not possess prayer oil. Plaintiff contends that his rights under the Religious Land Use and Institutionalized Persons Act are violated because he is not allowed to possess Islamic prayer oil in his cell.

#### a. Substantial burden

For largely the same reasons that I found plaintiff's religious practice was substantially burdened by being limited to one annual religious feast, I find also that plaintiff's religious freedom is substantially burdened by the denial of his request to

have Islamic prayer oil in his cell. In his amended complaint, plaintiff states that he is "denied access to buy and keep in [his] cell the 'religious prayer oil' for prayer 5 times daily, according to the teachings of Islam." Am. Compl., dkt. # 36 at 5. In response, defendants rely again on the affidavit and report of Chaplain Ronald Beyah. Affid. of Ronald Beyah, dkt. # 45, at Ex. E. Defendants acknowledge that "Muslims are compelled to make themselves clean and eliminate body odor in preparation for daily prayers." *Id.* However, according to Beyah's report, "[t]here is no such thing as 'Islamic Prayer Oil,'" and although "[f]ragrant oils can be used to eliminate body odor, [they] are not required by Islam" because regular bathing and use of deodorant will serve the same purpose. *Id.* In determining whether a prisoner's religious freedom is substantially burdened, however, the question is not whether a particular practice is *required* by the prisoner's faith, but rather whether "the practices in question are important to the votaries of the religion." *Mack*, 80 F.3d at 1180; *see also Salih v. Smith*, Civ. Nos. HAR 93–1556, HAR 93–1619, 1994 WL 750529, at *9 (D.Md. Nov.8, 1994) ("[i]t is inappropriate for this Court to make a finding regarding what Islam requires, or does not require, vis-à-vis religious oils. Federal courts do not sit as 'arbiters of religious orthodoxy.' ") (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 713, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)); *Munir v. Scott*, 792 F.Supp. 1472, 1481 (E.D.Mich.1992), *rev'd on other grounds*, 12 F.3d 213, 1993 WL 465162 (6th Cir. 1993) (describing affidavits of two Imams debating the significance to Muslims of Islamic prayer oil and concluding that "the use of prayer oils is entitled to constitutional protection under the free exercise clause"). I am convinced by the allegations in plaintiff's amended complaint and his summary judgment brief that his ina-

bility to possess prayer oil forces him to "refrain from religiously motivated conduct," *Mack*, 80 F.3d at 1179, and thus imposes a substantial burden on the exercise of his religion.

### b. Compelling interest/least restrictive means

Defendants advance several arguments in support of the internal management procedure dealing with religious property. They begin by noting the steadily increasing security, financial and administrative burdens the Department of Corrections has faced over the past 20 years. The result is a need for increasingly rigid and uniform restrictions on inmate property, including religious property.

Rather than addressing specifically the denial of plaintiff's request to possess prayer oil, defendants have argued more broadly that Internal Management Procedure 6A, which limits the religious property of Islamic inmates to religious books and publications, prayer beads, a prayer rug and a kufi-cap (and thus by definition prevents plaintiff from possessing prayer oil), is justified by the security and administrative concerns that arise as a result of an overabundance of inmate property. According to defendants, it was necessary to put general limitations on inmate property, including religious property. Even assuming that these security and administrative concerns are compelling governmental interests, I cannot find that defendants have employed the least restrictive means of furthering those interests.

Undoubtedly defendants must place limits on the amount of property inmates can possess. However, under the heightened scrutiny required by the act, the need to impose an overall property limit does not presumptively justify prohibiting the possession of all Islamic religious items other than the texts, prayer rugs, beads and kufi

caps acceptable under the internal management procedure. Although prison officials need not "do handsprings to accommodate the religious needs of inmates," *Mack*, 80 F.3d at 1180, the burdens imposed by managing inmate property could be addressed at a lower cost to inmate's religious freedom by, for instance, capping the overall amount of property a prisoner may possess and forcing prisoners who desire spiritual items to sacrifice secular ones in exchange. The same logic applies to defendants' security concerns. Defendants argue that inmate property must be controlled and searched regularly to prevent theft, bartering, strong-arming, gambling, the hiding of contraband and the manufacture of weapons and that the more property inmates own the more complicated searches become. However, these security concerns are a function of the overall volume of property prisoners possess. They could be addressed by a general cap on inmate property, leaving inmates to strike their own balance between religious and secular items while remaining within the confines of the property restriction. Defendants' security concerns are not related to any specific difficulties presented by the possession of prayer oil. They never suggest that prayer oil has such intrinsic value that its availability to inmates would increase the risk of theft, bartering, strong-arming or gambling or that prayer oil is particularly well suited for hiding contraband or slipping restraints, likely because such an argument would be awkward in light of plaintiff's uncontested assertion that baby oil is available for sale at the prison canteen. Accordingly, I am not persuaded that defendants have adopted the means least restrictive to inmate religious freedom in furtherance of their interest in limiting the administrative costs associated with inmate property and ensuring the efficiency of security-related searches.

However, defendants advance another line of argument that cannot be so easily dismissed. Defendants contend that "there are potentially innumerable 'religious' property items and variations of currently approved religious property items, especially given the hundreds of different religions and religious sects practices [sic] by Wisconsin inmates" and that each item "require[s] additional research and consultation with religious leaders in these areas." Br. in Supp. of Mot. for Summ. J., dkt. # 41, at 6. According to defendants, it is important "to clearly identify for staff, inmates, and outside religious advisors, those religious items that are necessary requirements for the religion, list them in IMP # 6A, and seek approved distributors of those products." *Id.* In other words, because the Wisconsin inmate population is so religiously diverse and the number of potential items having religious significance are so numerous, reviewing requests for religious goods and locating acceptable distributors of those goods would consume an inordinate amount of staff time and prison resources. These are weighty concerns that would not be solved entirely by placing a general cap on the total amount of property an inmate may possess. Indeed, the religious property regulation is similar to the feast regulation that the Court of Appeals for the Seventh Circuit approved in *Mack*, in that both regulations aggregate various sects into a small number of umbrella groups and place corresponding limits on religiously significant activities (feasts on the one hand and the acquisition of religious property on the other). However, I am not convinced that defendants' property regulation, as applied to plaintiff, can withstand the exacting least restrictive means test that Congress set forth in the Religious Land Use and Institutionalized Persons Act.

First, although defendants argue that a short, exclusive list of allowable religious

property items is necessary because reviewing individual requests for religious items would be too onerous, defendants' own regulation appears to contemplate just such a review process. Internal Management Procedure 6A refers to another regulation identified as "DOC–2075 Request For New Religious Practice." Although neither party has submitted a copy of DOC–2075, Internal Management Procedure 6 defines it as a "form used by inmates to request ... a new religious property item that is not on the approved property list" and procedure 6A notes that it is the warden's responsibility to "[f]orward DOC–2075 requesting religious property not on the approved list to the [Division of Adult Institutions]" and that it is the responsibility of the prison chaplain to "[r]eview DOC–2075 requests for additional religious property items [and to] [f]orward recommendations and reason for approval or disapproval to the Warden." Assuming this mechanism is designed to provide genuine review of inmate religious property requests, its existence casts significant doubt on defendants' contention that prison resources will be sapped inordinately by inmate requests for religious items not listed in the internal management procedure. It is noteworthy that the record does not show that defendants ever considered plaintiff's request for prayer oil under this review process. Plaintiff filed an inmate complaint regarding his inability to keep prayer oil in his cell, but the institution complaint examiner's report simply recites the list of items available to Muslim inmates under Internal Management Procedure 6A and notes that prayer oil is not on the list. Although this may be an efficient way of dealing with inmate requests for religious items, viewing the evidence in the light most favorable to plaintiff, as I must, I cannot conclude that defendants' internal management procedure, as it has been applied to plain-

tiff, represents the approach to controlling administrative costs and preserving prison resources that is least restrictive of plaintiff's exercise of religion.

Further, I note that the internal management procedure provides a mechanism by which prisoners may obtain and possess a single "religious emblem," such as a cross, in addition to the items on the inmate personal property list. Prisoners are permitted to request a religious emblem only once every six months. A similar periodic limit imposed on requests for other religious property would go a long way toward assuaging defendants' concerns regarding their scarce administrative resources without restricting prisoners to a short, rigid list of religious items.

The regulation's list of approved religious items is both rigid and austere. Internal Management Procedure 6A recognizes seven umbrella religion groups for purposes of inmate religious property. According to a chart incorporated into the regulation, in addition to the religious books and publications that members of each group are allowed to possess, Protestants are allowed to possess no other religious items (with the exception of the aforementioned "religious emblem" that would presumably cover a cross); Buddhists and Catholics are each allowed to possess one other item (prayer beads and a rosary, respectively); Wiccans are allowed two items (a "Book of Shadows" and religious art); Jewish inmates get three (a phylacteries, yarmulke and talith), as do Muslims (prayer beads, a prayer rug and a kufi-cap); and Native Americans may possess five items (a medicine bag, sweetgrass, sage, cedar and a feather). Thus, aside from religious books and a single religious emblem, the regulation identifies a total of 16 religiously significant items that Wisconsin's religiously heterogeneous inmates may possess, with no inmate al-

lowed more than five items (Native Americans) and some inmates limited to religious books and an emblem only (Protestants). I am not persuaded that defendants' reflexive reliance on this list of 16 items is the least restrictive means available to address their resource concerns.

To summarize, by basing their defense to plaintiff's prayer oil claim on Internal Management Procedure 6A, rather than identifying specific problems associated with prayer oil, defendants have asked this court essentially to endorse their list of 16 items as the least restrictive means for furthering their interest in controlling prison administrative costs. For the reasons discussed above, I decline to do so. Defendants' interest in limiting the volume of property possessed by inmates could be addressed at a lower cost to inmates' religious freedom by, for instance, capping the overall amount of property a prisoner may possess and forcing prisoners who desire spiritual items to sacrifice secular ones in exchange in order to remain under the cap. Defendants' argument that reviewing inmate requests for ostensibly religious goods would consume an inordinate amount of staff time and prison resources is belied by the fact that such a review mechanism is incorporated into the very regulation on which defendants rely in support of their refusal to allow plaintiff to possess prayer oil. Despite the existence of that review mechanism, the record does not reveal that plaintiff ever had the benefit of a genuine review of his request. Defendants may have some compelling interest related specifically to prayer oil that justifies their denial of plaintiff's request, but they have yet to articulate it. Instead, they rejected plaintiff's request out of hand because prayer oil is not among the small list of religious items presumptively available to prisoners.

Finally, I note that defendants suggest that plaintiff has available a reasonable alternative to keeping prayer oil in his cell because "Muslim inmates wishing to use oil in preparation for daily prayer can ask a DOC chaplain or other DOC sanctioned religious leader to request that he be allowed to give out the oil prior to or at prayer services." However, I do not understand plaintiff's request to be limited to having prayer oil only at "prayer services," but rather that he have access to prayer oil each of the five times he prays daily. Nor do I understand defendants to suggest that they are willing to have Department of Corrections chaplains distribute prayer oil to Muslim inmates five times each day, a solution that would make little sense in light of the department's resource problems.

I am acutely aware of the enormous resource and security challenges faced by today's prison administrators. Nevertheless, in passing the Religious Land Use and Institutionalized Persons Act, Congress has chosen to raise the bar for prison administrators when it comes to balancing their security and resource concerns against the rights of institutionalized persons to practice their faith. *See* 146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) ("Whether from indifference, ignorance, bigotry, *or lack of resources*, some institutions restrict religious liberty in egregious and unnecessary ways.") (emphasis added). I do not believe defendants have acted egregiously to restrict inmate religious liberty in promulgating the religious property internal management procedure at issue in this case but whether a regulation's effect is egregious is not the question the act requires courts to consider. Rather, the act requires that substantial burdens on the religious exercise of institutionalized persons be supported by a compelling governmental interest that is furthered by the *least* restrictive means at an administrator's disposal. *See Murphy*, 148

F.Supp.2d at 190 ("[D]efendants must show that there are 'no other alternative forms of regulation' which would fulfill the state interest.") (citing *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

For better or worse, prison administrators are now required to deal with the consequences of Congress's instruction to the courts to apply the exacting scrutiny required by the act to prison regulations, a reality of which the act's congressional supporters were well aware. *See* 146 Cong. Rec. S7779 (daily ed. July 27, 2000) (statement of Sen. Reid) (explaining support for the act but expressing "serious reservations about the inclusion of prisoners" under the act's "strict scrutiny" standard). That the bar has been raised is true even though Congress noted that it "expects that courts will continue the tradition of giving due deference" to prison administrators, *Id.* at S7775 (joint statement of Sens. Hatch and Kennedy), for to conclude otherwise would make the act's plain language ring hollow. *See Smith*, 494 U.S. at 888, 110 S.Ct. 1595 ("[I]f 'compelling interest' really means what it says (and watering it down here would subvert its rigor in the other fields where it is applied), many laws will not meet the test."). Accordingly, viewing the evidence in the light most favorable to plaintiff, I conclude that Internal Management Procedure 6A, as it has been applied to plaintiff, violates the Religious Land Use and Institutionalized Persons Act because it does not represent the approach to controlling administrative costs and preserving prison resources that is least restrictive of plaintiff's exercise of his religion.

### 3. *Constitutional challenge to the act*

Although I conclude that defendants' application of Internal Management Procedure 6A to plaintiff's request for prayer oil cannot pass muster under the Religious Land Use and Institutionalized Persons Act, plaintiff cannot yet declare victory because defendants have challenged the act's constitutionality on a variety of grounds. Pursuant to 28 U.S.C. § 2403, I must certify to the Attorney General of the United States the fact that defendants have drawn into question the constitutionality of the act and give the United States an opportunity to intervene for argument on the question of the act's constitutionality. The United States will be given until May 3, 2002, to advise the court whether it wishes to intervene for any purpose. If the United States chooses to intervene, a briefing schedule will be established to allow it to be heard on the constitutionality of the law. Accordingly, the May 6, 2002 trial date will be cancelled.

### B. *First Amendment*

■ In *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Supreme Court enunciated the proper standards to be applied in considering prisoners' free exercise claims. The Court held that prison restrictions that infringe on an inmate's exercise of his religion will be upheld if they are reasonably related to a legitimate penological interest. *Id.* at 349, 107 S.Ct. 2400. The Court of Appeals for the Seventh Circuit has identified several factors that can be used in applying the "reasonableness" standard:

1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;

2. whether there are alternative means of exercising the right in question that remain available to prisoners;

3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and

4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

*Al–Alamin v. Gramley,* 926 F.2d 680, 685 (7th Cir.1991) (quoting *Williams v. Lane,* 851 F.2d 867, 877 (7th Cir.1988)) (additional quotation marks omitted).

Because plaintiff's claim that he was prevented from celebrating more than one religious feast each year failed under the heightened scrutiny required by the Religious Land Use and Institutionalized Persons Act, it cannot succeed under the rational basis standard applied to prisoners' claims under the First Amendment's free exercise clause, which is far more deferential to prison administrators than the test established by the act. Similarly, defendants have articulated clearly legitimate interests in preserving scarce prison resources and enhancing prison security. These interests are furthered by the religious property regulation, which is aimed at reducing administrative costs and streamlining the process of searching cells and monitoring inmate property. Most important, under the First Amendment, defendants need not satisfy a least restrictive alternative test. Accordingly, I conclude that defendants' religious property regulation is rationally related to legitimate penological interests. Defendants' motion for summary judgment will be granted as to all plaintiff's First Amendment claims.

### C. *Qualified Immunity*

■ Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known at the time the violation occurred. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Courts employ a two-part analysis to determine whether government officials are protected by qualified immunity. First, the court determines whether the plaintiff's claim states a violation of his constitutional or statutory rights. If the first step is satisfied, the court then determines whether those rights were clearly established at the time the violation occurred. *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). *See also Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasizing importance of close analysis of factual allegations in determining whether claim states constitutional violation). I have found that plaintiff states a claim under the Religious Land Use and Institutionalized Persons Act by alleging that he is not allowed to possess Islamic prayer oil in his cell. Although plaintiff's claim may fail ultimately because the question of the act's constitutionality has yet to be decided, I conclude that even if the act is constitutional and plaintiff therefore prevails on his claim under the act, defendants are shielded from liability for money damages based on their qualified immunity defense. The Supreme Court has warned against defining the right at issue too broadly lest the protection afforded by the qualified immunity doctrine be eroded. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To invoke a "clearly established" right, explained the Court, a plaintiff must point to something "more particularized" than simply the abstract right guaranteed by federal law. *Id.* at 640, 107 S.Ct. 3034. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* On the other hand, the plaintiff need not point to a case involving the exact scenario so long as the unlawfulness of the official action is apparent in the light of pre-existing law. *Id.; see also*

*Nabozny v. Podlesny,* 92 F.3d 446, 456 (7th Cir.1996) ("[u]nder the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point").

Plaintiff believes he has found a case directly on point. He cites *Munir v. Scott,* 792 F.Supp. 1472 (E.D.Mich.1992), a case involving a prison's total ban on all religious prayer oils. In that case, because the defendant warden "submitted absolutely no evidence to demonstrate that the total ban on prayer oil was reasonable and penologically justified," the district court found that the plaintiffs were "entitled to summary judgment on their claim for damages resulting from defendant['s][ ] complete ban on religious oils." *Id.* at 1483. The court also concluded that the defendant in that case had not presented any evidence that "a reasonable warden would have believed that a total ban on oil was justified by institutional concerns" and was therefore not entitled to qualified immunity. *Id.* at 1479–80. Plaintiff's reliance on *Munir* is misplaced because the Court of Appeals for the Sixth Circuit subsequently reversed the district court's qualified immunity determination, holding that the defendant's articulated security concerns, including the possibility that the oil's glass bottles would be used as weapons or that the oil itself would be used to slip restraints, were sufficient "to bring [defendant's] decision within the ambit of reasonableness." *Munir v. Scott,* 12 F.3d 213, 1993 WL 465162, at *2 (6th Cir.1993).

I recognize that plaintiff is not required to find a prior case directly on point in order to defeat defendants' qualified immunity defense. Nevertheless, at the time defendants' religious property regulation took effect in April 2001, the Religious Land Use and Institutionalized Persons Act had been in existence for only six months. Even now there are almost no cases applying its provisions covering institutionalized persons. In addition, although the Religious Freedom Restoration Act imposed a standard of review nearly identical to the one found in the Religious Land Use and Institutionalized Persons Act, I am aware of no case applying the former act that would suggest that defendants' refusal to allow plaintiff to possess prayer oil in his cell constituted a violation of plaintiff's clearly established rights under the act. Accordingly, I conclude that defendants are qualifiedly immune from plaintiff's claim for monetary damages.

#### D. *Plaintiff's Motions for Extension of Time, Delay of Judgment and Appointment of Counsel*

On March 18, 2002, plaintiff filed a motion for an extension of time in which to file a cross motion for summary judgment. Dkt. # 58, at 1. Plaintiff's motion is unnecessary and will be denied. Defendants will be granted summary judgment on all of plaintiff's claims except his claim that his rights under the Religious Land Use and Institutionalized Persons Act were violated when he was not allowed to possess prayer oil in his cell. In addition, plaintiff is entitled only to injunctive and declaratory relief on his surviving claim, as defendants are immune from money damages on that claim. As to that surviving claim, it remains to be determined whether defendants can prevail on the basis of their arguments regarding the act's constitutionality. Before deciding that issue, I must allow the United States the opportunity to intervene to defend the act. Once the United States has decided whether to intervene and I have considered all the parties' arguments regarding the act's constitutionality, I will either grant defendants' summary judgment motion as to plaintiff's remaining claim or I will enter summary judgment for plaintiff on that claim on the court's own motion. *Borcherding–Dittloff v. Corporate Receivables,*

*Inc.,* 59 F.Supp.2d 822, 826 (W.D.Wis. 1999); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 3d § 2720 at 347 (1998) (summary judgment may be entered in favor of non-moving party even though no formal cross-motion has been filed). Thus, plaintiff need not file a motion for summary judgment.

On March 29, 2002, plaintiff filed a "Motion for Delay of Judgment on Defendants Request for Summary Judgment Pursuant to Rule 56(f) F.R.C.P. & Motion for Appointment of Counsel." Dkt. # 61, at 1. In support of his Rule 56(f) motion, plaintiff makes conclusory allegations about difficulties he has had with the prison librarian but does not explain specifically how these problems have prevented him from presenting factual affidavits or other materials in response to defendants' motion. Plaintiff's Rule 56(f) motion will be denied.

I will reserve decision on plaintiff's motion for appointment of counsel until it is known whether the United States will intervene in order to defend the constitutionality of the Religious Land Use and Institutionalized Persons Act. If the United States does intervene to defend the act, appointed counsel will be unnecessary. The act's constitutionality is the only question remaining in this case and the United States will provide more than adequate representation on that question. If the United States opts not to intervene, counsel will be appointed for defendant.

### ORDER

1. Defendant Dick Verhagen's and Jon Litscher's motion for summary judgment as to plaintiff Jerry Charles's claims under the First Amendment's free exercise clause is GRANTED;

2. Defendants' motion for summary judgment as to plaintiff's claim under the Religious Land Use and Institutionalized Persons Act relating to religious feasts is GRANTED;

3. Defendants are qualifiedly immune to plaintiff's demand for money damages on his claim under the Religious Land Use and Institutionalized Persons Act relating to prayer oil;

4. The United States of America may have until May 3, 2002, in which to advise the court whether it wishes to intervene in this case. If the United States informs the court that it wishes to intervene, a briefing schedule will be set at that time;

5. A decision on plaintiff's motion for appointment of counsel is reserved until the United States advises the court whether it will intervene in this case; and

6. Plaintiff's motions for an extension of time in which to file a cross motion for summary judgment and for a delay of judgment under Fed.R.Civ.P. 56(f) are DENIED.

7. The May 6, 2002 trial date in this case is CANCELLED.