Tayr KILAAB AL GHASHIYAH (KHAN) formerly known as John Casteel, Plaintiff,

and

United States of America, Plaintiff–Intervenor,

v.

DEPARTMENT OF CORRECTIONS OF THE STATE OF WISCONSIN, Jon E. Litscher, Daniel Bertrand, Michael Baenen, Kenneth Morgan, Christopher Ellerd, Judy Smith, Gary McCaughtry, Gene Dobberstein, and Phillip Macht, Defendants.

No. 01–C–10.

United States District Court, E.D. Wisconsin.

March 4, 2003.

Tayr Kilaab Al Ghashiyah, pro se.

Andrea Baker, Diane Kelleher, for Defendants.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Tayr Kilaab al Ghashiyah (Khan), a Muslim formerly known as John

Casteel and currently a prisoner at the Green Bay Correctional Institution (GBCI), filed this pro se civil rights action under 42 U.S.C. § 1983 against the Wisconsin Department of Corrections (DOC) and various corrections officials and employees. Following a screening of the complaint pursuant to 42 U.S.C. § 1915A, plaintiff was allowed to proceed on claims that defendants violated his rights under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc–1(a), et. seq., by failing to accommodate his religious dietary requirements; denying him the use and possession of candles, incense, oils, and religious talismans; and prohibiting him from using his legal (Muslim) name.

Defendants have moved to dismiss, arguing that (1) RLUIPA is unconstitutional, (2) the deprivation of incendiary materials such as candles, incense, and oil does not violate the First Amendment, and (3) the individual defendants are entitled to qualified immunity. Because the constitutionality of a federal statute had been challenged, I allowed the United States of America to intervene in defense of RLUIPA. The issues have been fully briefed and are ready for decision.

## I. CONSTITUTIONALITY OF RLUIPA

Defendants contend that RLUIPA is unconstitutional because it violates the separation of powers doctrine, exceeds Congress's enforcement power under Section Five of the Fourteenth Amendment, is not applicable to state prisoners' claims against state prison officials, violates the Establishment Clause, and is not a valid exercise of Congress's power under the Commerce and Spending Clauses. The United States counters that RLUIPA is a constitutional exercise of Congress's power under the Spending and Commerce Clauses, and that it does not violate any other constitutional provision or doctrine.

Before turning to the specific arguments, it is appropriate to set forth the events leading to the passage of RLUIPA, because the reasons for its enactment bear directly on its constitutionality.

### A. Background of RLUIPA

In 1990, the Supreme Court held, in *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879, 110 S.Ct. 1595 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring)).

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling—permitting him, by virtue of his beliefs, to become a law unto himself—contradicts both constitutional tradition and common sense.

*Id.* at 885, 110 S.Ct. 1595 (internal quotation marks and citations omitted).

Prior to *Smith*, the Supreme Court had held that laws substantially affecting the practice of religion were subject to strict constitutional scrutiny. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating compulsory

school attendance laws as applied to Amish parents who refused on religious grounds to send their children to school); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (reversing denial of unemployment compensation benefits to employee terminated for refusing to work on her religious Sabbath day).[1] Under the *Sherbert* standard, state actions that substantially burdened a religious practice had to be justified by a compelling governmental interest. 374 U.S. at 402–03, 83 S.Ct. 1790. In *Smith,* the Court rejected this test, holding "that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *City of Boerne v. Flores,* 521 U.S. 507, 514, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

In response to *Smith,* Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb et seq., pursuant to its enforcement powers under Section Five of the Fourteenth Amendment.[2] RFRA's stated purposes were:

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b). RFRA prohibited government from substantially burdening a person's exercise of religion, even if the burden resulted from a rule of general applicability, unless the government could demonstrate that the burden was imposed in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1.

Four years later, the Supreme Court responded to this legislative effort to overrule *Smith* by striking down RFRA as an act in excess of congressional power under § 5. *City of Boerne,* 521 U.S. at 536, 117 S.Ct. 2157. Congress's power under § 5 is "remedial" and extends only to enforcing the provisions of the Fourteenth Amendment, the Court noted; Congress may not through legislation alter the meaning of the substantive rights guaranteed by the Amendment. *Id.* at 518–19, 117 S.Ct. 2157. But, the Court concluded, that is exactly what Congress tried to do with RFRA, effecting a substantive change in the meaning of the Free Exercise Clause as construed by the Court in *Smith. Id.* at 532–36, 117 S.Ct. 2157.

In a concurring opinion, Justice Stevens stated:

In my opinion, the Religious Freedom Restoration Act of 1993 (RFRA) is a "law respecting an establishment of religion" that violates the First Amendment to the Constitution.

---

**1.** It must be noted that the Court's application of the strict scrutiny standard prior to *Smith* was uneven. *See Smith,* 494 U.S. at 883, 110 S.Ct. 1595 ("We have never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation."); *see also* Christopher L. Eisgruber & Lawrence G. Sager, *Why The Religious Freedom Restoration Act is Unconstitutional,* 69 N.Y.U. L.Rev. 437, 445–46 (1994) ("The compelling state interest test had a genuinely odd career in the accommodation

cases that preceded *Smith.)* [O]utside the charmed precincts of unemployment benefits and the *Sherbert* quartet, those seeking religious exemptions from otherwise valid laws have prevailed on only one occasion: in *Wisconsin v. Yoder* . . . ."

**2.** Section 5 grants Congress the "power to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment. U.S. Const. amend. XIV, § 5.

If the historic landmark on the hill in Boerne happened to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure. Because the landmark is owned by the Catholic Church, it is claimed that RFRA gives its owner a federal statutory entitlement to an exemption from a generally applicable, neutral civil law. Whether the Church would actually prevail under the statute or not, the statute has provided the Church with a legal weapon that no atheist or agnostic can obtain. This governmental preference for religion, as opposed to irreligion, is forbidden by the First Amendment. *Wallace v. Jaffree,* 472 U.S. 38, 52–55, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

*Id.* at 536–37, 117 S.Ct. 2157 (Stevens, J., concurring).

Congress then passed RLUIPA in 2000,[3] limiting the scope of the Act's coverage but using the same strict scrutiny standard as in RFRA. The Act provides in relevant part:

(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the

government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).[4]

If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2 [42 USCS § 2000cc], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

42 U.S.C. § 2000cc–2(b).

Congress used its power under the Commerce and Spending Clauses to enact RLUIPA. *See* 42 U.S.C. § 2000cc–1(b). The Act is to be construed broadly to favor the protection of inmates' religious exercise. 42 U.S.C. § 2000cc–3(g).

A number of courts have addressed the issue of whether RLUIPA is constitutional; most have held that it is. *E.g., Mayweathers v. Newland,* 314 F.3d 1062 (9th Cir.2002); *Johnson v. Martin,* 223 F.Supp.2d 820 (W.D.Mich.2002); *Gerhardt*

---

**3.** The House of Representatives passed a bill entitled the *Religious Liberty Protection Act* earlier in 2000, which like RFRA called for application of a strict scrutiny test to be applied to state and local laws that infringed on the free exercise of religion, but the bill died in the Senate due to concerns about its broad nature and potential effect on civil rights laws in areas such as employment and housing. Ada–Marie Walsh, Note, *The Religious Land Use and Institutionalized Persons Act of 2000: Unconstitutional and Unnecessary,* 10 Wm. & Mary Bill of Rts. J. 189, 192 (2001). RLUIPA was then introduced, and the bill sailed

through both houses of Congress with no public hearings and after suspension of the rules. *Id.* at 196.

**4.** The other main section of RLUIPA deals with governmental imposition of land use regulations that substantially burden the religious exercise of a person, including a religious assembly or institution. *See* 42 U.S.C. § 2000cc(a). When referring to RLUIPA in this opinion, I refer to that portion of the Act which applies to those, such as plaintiff, who are confined to an institution.

*v. Lazaroff*, 221 F.Supp.2d 827 (S.D.Ohio 2002); *Charles v. Verhagen*, 220 F.Supp.2d 955 (W.D.Wis.2002). However, one court has recently held that the section of RLUIPA governing the claims of prison inmates, 42 U.S.C. § 2000cc–1, violates the Establishment Clause. *Madison v. Riter*, 240 F.Supp.2d 566 (W.D.Va.2003). Because the Establishment Clause challenge is the most significant of defendants' challenges to RLUIPA, particularly in light of Justice Stevens's concurrence in *City of Boerne*, it is appropriate to begin my analysis of the constitutionality of RLUIPA by deciding whether it violates the Establishment Clause.

## B. Establishment Clause Challenge

### 1. Effect of *Sasnett v. Sullivan*

As an initial matter, I must determine whether the issue of RLUIPA's constitutionality under the Establishment Clause is foreclosed in this District by the Seventh Circuit's decision in *Sasnett v. Sullivan*, 91 F.3d 1018 (7th Cir.1996), *vacated by Sullivan v. Sasnett*, 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997). In *Sasnett*, the court stated: "We defer to the Fifth Circuit's analysis [in *Flores v. City of Boerne* ] of why [RFRA] also does not violate the separation of powers or the establishment clause of the First Amendment." *Id.* at 1022. In *Flores v. City of Boerne*, 73 F.3d 1352 (5th Cir.1996), *rev'd*, *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Fifth Circuit found, with little analysis, that RFRA did not violate the Establishment Clause. The Seventh Circuit's *Sasnett* decision was vacated by the Supreme Court following the issuance of *City of Boerne*, 521 U.S. 507, 117 S.Ct. 2157.

I cannot conclude that a vacated Seventh Circuit opinion considering a different statute that "defers" to the decision of another court which was later reversed is dispositive of this issue. Aside from the fact that both circuit court decisions were extinguished by the Supreme Court, *Sasnett* did not hold that RFRA comported with the Establishment Clause: rather, it deferred without explanation to an opinion that did. I agree with Judge Crabb's statement in *Charles*, 220 F.Supp.2d at 967, that an Establishment Clause challenge to RLUIPA may be an "uphill battle" in light of *Sasnett*, but it is not a lost cause. I therefore proceed to the merits of defendants' challenge.

### 2. Analytical Approach to an Establishment Clause Challenge

■ The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. The Clause prevents the government from endorsing or affiliating with any particular religious doctrine or organization, expressing a preference between religions, or promoting religion generally. *See, e.g., Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (stating that "a principle at the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion."); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 8–9, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion) (internal quotation marks omitted) ("It is part of our settled jurisprudence that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization."); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("The First Amendment mandates governmental neutrality between [different] religion[s], and between religion and nonreligion."); *Everson v. Bd. of Educ. of Ewing Tp.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711

(1947) (stating that government may not "aid one religion, aid all religions, or prefer one religion over another").

The Supreme Court has formulated a three-pronged test to determine whether a statute complies with the Establishment Clause. *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under the test, a statute is permissible if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create excessive entanglement between government and religion. *Id.* at 612–13, 91 S.Ct. 2105. The challenged practice or law violates the Establishment Clause if it fails to satisfy any of these prongs. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

While the Court has at times modified the *Lemon* test, *see, e.g., Agostini v. Felton*, 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (analyzing "entanglement" as an aspect of the "effect" inquiry); *County of Allegheny v. ACLU*, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (articulating the first two prongs of the *Lemon* inquiry in terms of an "endorsement test"); *Lemon* "remains the prevailing analytical tool for the analysis of Establishment Clause claims." *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 301 (7th Cir.2000). Accordingly, I will apply the *Lemon* factors in determining whether RLUIPA violates the Establishment Clause.

### 3. Application of the *Lemon* Test

Defendants argue that RLUIPA's plain purpose is to single out religious practice as congressionally favored activity, that RLUIPA has the effect of elevating the exercise of religion over nonreligious activities in prison, and that RLUIPA creates excessive entanglement between government and religion by forcing every prison

to become an expert on every religion and every inmate's religious exercise.

The United States maintains that RLUIPA is a permissible effort by government to allow, without promoting, the practice of religion unmolested by the state. It contends that RLUIPA satisfies the three-part *Lemon* test because it has a legitimate secular purpose—to protect the free exercise of religion from unnecessary governmental interference, has a primary effect that neither advances nor inhibits religion, and does not entangle the state in an unlawful fostering of religion. Instead, by reducing governmental interference with religious exercise, the United States contends that RLUIPA achieves a more complete separation of church and state.

#### a. Purpose of RLUIPA

The first prong of the *Lemon* test " 'asks whether the government's actual purpose is to endorse or disapprove of religion.' " *Edwards*, 482 U.S. at 583, 107 S.Ct. 2573 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring)). The secular purpose requirement aims at preventing government "from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). A statute that is motivated in part by a religious purpose may satisfy this criterion, but "the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion." *Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

However, the Court has acknowledged "that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the

Establishment Clause." *Amos,* 483 U.S. at 334, 107 S.Ct. 2862. In considering religious accommodation statutes under the first prong of the *Lemon* test, the Court has noted that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 335, 107 S.Ct. 2862. The Constitution does "not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice. Rather, there is ample room under the Establishment Clause for benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Grumet,* 512 U.S. at 705, 114 S.Ct. 2481 (internal citation and quotation marks omitted).

The United States contends that RLUIPA was designed to protect the free exercise of religion from unnecessary governmental interference and, thus, is a permissible accommodation statute. RLUIPA's purpose is described in the Congressional Record:

> [P]rison officials sometimes impose frivolous or arbitrary rules. Whether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways. . . . This Act can provide a remedy and a neutral forum for such cases if they fall within the reach of the Spending Clause or the Commerce Clause.

146 Cong Rec. at S7775 (quoted in Intervenor's Mem. in Support of the Constitutionality of RLUIPA, Ex. 5). RLUIPA also provides that, "Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment to the Constitution prohibiting laws respecting an establishment of religion." 42 U.S.C. § 2000cc–4.

Thus, at first blush it may appear that RLUIPA has a valid purpose under the Establishment Clause as construed in *Amos*—it seeks to accommodate religion by removing governmentally imposed burdens on its exercise. However, the sweeping nature of the statute far surpasses that of any accommodation statute that the Supreme Court has previously sustained. Thus, I must look closely at whether, based on the Court's accommodation cases, RLUIPA can be said to have a secular purpose.

The leading case on religious accommodation is *Amos.* There, the Court upheld against an Establishment Clause challenge a statutory exemption for religious organizations from Title VII's prohibition on religious discrimination. 483 U.S. at 336–39, 107 S.Ct. 2862. As noted, the Court found that the statute satisfied *Lemon's* first prong by declaring that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 335, 107 S.Ct. 2862. The Court cited no authority for this proposition, which seems at odds with *Lemon's* purpose inquiry,[5] but then went on to offer an explanation for its acceptance of this particular accommodation that squared with the balance of the *Lemon* test.

The Court noted that, absent an exemption from Title VII's general prohibition on religious discrimination, secular courts would be called upon to interfere in the internal workings of religious organizations. *Id.* at 336, 107 S.Ct. 2862. Moreover, "[f]ear of potential liability might

---

**5.** One commentator has called *Amos* "one of the most deferential and least logically convincing Establishment Clause analyses ever undertaken by the Court." Scott C. Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power,* 73 Tex. L.Rev. 247, 290–91 (1994).

affect the way an organization carried out what it understood to be its religious mission." *Id.* In other words, without the exemption, "government would become entangled with religion[, making] an exemption necessary to *avoid* an Establishment Clause violation." Marci A. Hamilton, *The Religious Freedom Restoration Act is Unconstitutional, Period,* 1 U. Pa. J. Const. L. 1, 13 (1998) (emphasis added).[6]

Properly understood, then, *Amos* cannot be said to validate *all* legislation enacted with the purpose of accommodating or exempting religion from general laws, as later decisions have made clear. *E.g., Texas Monthly,* 489 U.S. at 25, 109 S.Ct. 890 (striking down exemption for religious periodicals from state sales tax).[7] Nor can *Amos* be said to provide a definitive answer to whether RLUIPA complies with the *Lemon* test. Professor Hamilton's observation concerning RFRA is every bit as applicable to RLUIPA on this issue:

> Comparing RFRA to *Amos* is like comparing apples to oranges. RFRA, unlike *Amos,* does not exempt religion from regulation for the purpose of avoiding an Establishment Clause violation. Rather, RFRA institutes a standard of judicial review in every case which implicates religious conduct. In turn, this standard of review creates incentives for government to monitor, watch and keep track of the theological tenets of every religion in society. If government is to avoid the costly litigation attendant upon a multiplicity of RFRA claims, it must scrutinize every law that it passes with the interests of every religion in mind. It is not enough to be neutral. Government must also be vigilant for religion.

> By instituting an extremely demanding standard of judicial review applicable in every case which implicates religious conduct, RFRA creates incentives for government to become a theological overseer.

> RFRA induces the very sort of entanglement that the law in *Amos* avoided. *Amos* did not involve a law that exempted religion from every law in the country. Rather, it permitted the exemption of religious employers from a particular requirement in prescribed circumstances. The law in Amos lacked RFRA's vast scope; therefore, *Amos* cannot dictate how RFRA fares under the Establishment Clause.

Hamilton, *supra,* at 13–14 (footnote omitted); *see also* Idleman, *supra,* at 294 (stating that RFRA "is not really an accommodation statute at all, but rather an across-the board mandate of accommodation for all religious claimants in all governmental situations").

 Because it too mandates an across the board accommodation for religious inmates, a strong argument can be made that RLUIPA's purpose is to advance religion in prisons relative to other constitutionally protected conduct. *Cf.* Idleman, *supra,* at 285–86. Constitutional claims brought by inmates, including those under the Free Exercise Clause, are analyzed under a rational basis test. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Not so with RLUIPA, which mandates a strict scrutiny test. Thus, religion and religion alone receives a higher degree of governmental

---

**6.** Justice Brennan also made this clear in his concurring opinion in *Amos.* "A case-by-case analysis for all activities therefore would both produce excessive government entanglement with religion and create the danger of chilling religious activity." *Amos,* 483 U.S. at 344, 107 S.Ct. 2862 (Brennan, J., concurring).

**7.** *See also Estate of Thornton v. Caldor,* 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (striking down statute that required employers to accommodate employees' observation of religions Sabbath days).

protection. By providing more protection for inmates' religious rights than any other rights Congress could reasonably be said to have abandoned neutrality and acted with the purpose of furthering religion. However, I need not make this finding, for even if I take Congress at its word that its purpose was accommodation rather than promotion, a valid secular purpose does not prevent a statute from going too far and having the primary effect of advancing religion. *Madison,* 240 F.Supp.2d at 572 n. 4.

### b. Effect of RLUIPA

■ "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch,* 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring). The core notion animating this requirement "is not only that government may not be overtly hostile to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community." *Texas Monthly,* 489 U.S. at 9, 109 S.Ct. 890.

The United States contends that RLUIPA satisfies *Lemon's* effect prong because it does not promote or subsidize a religious belief or message. Rather, the Act merely frees religious individuals to practice as they otherwise would in the absence of certain state-imposed regulations. Although that may be the stated purpose of RLUIPA, I conclude that the Act has the primary effect of advancing religion, in violation of the Establishment Clause.

The mere fact that government acts to remove barriers to the free exercise of religion does not mean that the statute does not have impermissible effects. *See Amos,* 483 U.S. at 334–35, 107 S.Ct. 2862 (internal quotation marks omitted) ("At some point, accommodation may devolve into an unlawful fostering of religion ....."). In deciding whether a governmental action constitutes permissible discretionary accommodation under the Establishment Clause, the Court has looked to a number of factors, including (1) the extent to which the governmentally created exemption is extended to nonreligious persons or institutions, and not simply to religious ones;[8] (2) the magnitude of the resulting burden placed on nonbeneficiaries,[9] and the extent to which permitting the accommodation might induce, rather than simply facilitate, religious belief or practice;[10] and (3) the substantiality of

8. *Compare Grumet,* 512 U.S. at 694–704, 114 S.Ct. 2481 (holding that a statute creating a school district comprised entirely of members of the Satmar Hasidic sect violated the Establishment Clause); *and Texas Monthly,* 489 U.S. at 15–17, 109 S.Ct. 890 (striking down a sales tax exemption that applied only to religious organizations); *with Walz v. Tax Comm'n,* 397 U.S. 664, 672–73, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding property tax exemption for religious organizations enacted as part of general law exempting other non-profit organizations).

9. *See Texas Monthly,* 489 U.S. at 15, 109 S.Ct. 890 (asking whether the exemption "burdens

nonbeneficiaries markedly"); *Caldor,* 472 U.S. at 710 & n. 9, 105 S.Ct. 2914 (emphasizing the burdens that a statute requiring employers to accommodate employees' observation of religious Sabbath days imposed on those employees who did not observe a Sabbath).

10. *Texas Monthly,* 489 U.S. at 9, 109 S.Ct. 890 (stating that government may not compel nonadherents to support religious practices); Michael W. McConnell, *Accommodation of Religion: An Update and a Response to the Critics,* 60 Geo. Wash. L.Rev. 685, 700–02 (1992) (distinguishing accommodations that

the free exercise burden removed due to the exemption.[11] Idleman, *supra*, at 289. Analysis of these factors leads ineluctably to the conclusion that in enacting RLUIPA Congress elevated religion to the status of congressionally preferred activity, in violation of the Establishment Clause.

### i. RLUIPA Applies Only to Religious Practices

First, RLUIPA covers only religious practices; it extends no heightened protection to inmates seeking to exercise their rights of free speech, association, marriage, or procreation. As noted, claims alleging violation of such constitutional rights in a prison setting are analyzed under a rational basis standard. *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. The *Turner* rational relationship standard applies to all cases in which "a prisoner asserts that a prison regulation violates the Constitution" and to "all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

The Court has explained the reason why inmates' constitutional rights should be judged under a different standard than those of free citizens. "To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringement of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349, 107 S.Ct. 2400. This standard "ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison

administration,' and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'" *Id.* at 349–50, 107 S.Ct. 2400 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

But RLUIPA upsets this balance. As the court noted in *Madison:*

> RLUIPA singles out religious rights from the fundamental rights encompassed within the *Turner* test and establishes a drastically increased level of protection for such rights. Under RLUIPA, prison regulations that substantially burden religious belief, including those that are generally applicable and facially neutral, are judged under a strict scrutiny standard, requiring prison officials, rather than the inmate, to bear the burden of proof that the regulation furthers a compelling penological interest and is the least restrictive means of satisfying this interest. 42 U.S.C. § 2000cc–1. As is well known from the history of constitutional law, the change that RLUIPA imposes is revolutionary, switching from a scheme of deference to one of presumptive unconstitutionality. *See Smith*, 494 U.S. at 888, 110 S.Ct. at 1605. Instead of rational, the penological interest under RLUIPA must be of the highest order, *see Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972); *Jenkins v. Angelone*, 948 F.Supp. 543, 546 (E.D.Va.1996); instead of focusing on the prison inmate's ability to find other avenues to exercise his belief, a court is required to focus on the prison administrator's choice among reg-

---

remove a significant obstacle to the exercise of religious belief from those that induce a person to adopt a religion in order to benefit from the accommodation).

**11.** *See Texas Monthly,* 489 U.S. at 15, 109 S.Ct. 890 (asking whether an exemption can "reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion").

ulatory options, *see* 42 U.S.C. § 2000cc–1(a)(2); instead of placing the burden of proof on an inmate, RLUIPA throws the burden on prison officials, *see id.* § 2000cc–1(a). It is hard to imagine a greater reversal of fortunes for the religious rights of inmates than the one involved in the passage of RLUIPA.

*Madison*, 240 F.Supp.2d at 574–75.

Congress effected this drastic change in prison administration without any evidence that *religious* rights were in greater danger of arbitrary deprivation at the hands of correctional officials than other constitutional rights. *Id.* at 575 (collecting cases where other constitutional rights were violated).[12] The effect, therefore, is to provide greater protection to religiously motivated conduct than other conscientious conduct. In *Madison*, Judge Turk provided this example of the anomaly created by RLUIPA:

> Assume, for example, that a prison official confiscates white supremacist literature held by two different inmates. One inmate is a member of the Aryan Nation solely because of his fanatical belief that a secret Jewish conspiracy exists to control the world. The second inmate holds the white supremacist literature because he is a member of the Church of Jesus Christ Christian, Aryan Nation ("CJCC"). The non-religious inmate may challenge the confiscation as a violation of his rights to free expression and free association. A court would evaluate these claims under the deferential rational relationship test in *Turner*, placing a high burden of proof on the inmate and leaving the inmate with correspondingly dim prospects of success. *See Haff v. Cooke*, 923 F.Supp. 1104 (E.D.Wis.1996). However, the religious

inmate, as a member of the CJCC, may assert a RLUIPA claim, arguing that the confiscation places a substantial burden on his religious exercise. The religious white supremacist now has a much better chance of success than the non-religious white supremacist, as prison officials bear the burden of proving that the prison policy satisfies a compelling interest and is the least restrictive means of satisfying the interest. *Id.* at 1115 ("If this court applied a RFRA test more stringent than the *Turner* test, this court would force prisons to favor prisoners' religious material over their secular material because prisons would need a better justification to confiscate religious material than political material.") The difference in the level of protection provided to each claim lies not in the relative merits of the claims, but lies instead in the basis of one claim in religious belief. *See id.* (holding that, applying a strict scrutiny standard under RFRA, the plaintiff "would possess the white supremacist material solely because of its relation to exercising his religious, as opposed to his political, rights.").

*Id.* at 576.

Judge Turk concluded:

The singling out of religious belief as the one fundamental right of prisoners deserving of legislative protection rejects any notion of congressional neutrality in the passage of RLUIPA. In the absence of any proof that religious rights are more at risk in prison than other fundamental rights, and with the knowledge that strict scrutiny is not required to protect the religious belief of prisoners under the Free Exercise Clause,

---

**12.** Certainly, religion is not the *only* constitutional right denied inmates on questionable penological grounds. *See, e.g., Gerber v. Hickman*, 291 F.3d 617 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 123 S.Ct. 558, 154 L.Ed.2d 462 (2002) (holding that prison officials could bar inmate from artificially inseminating his wife).

Congress acted only to protect religious rights. Such an action, while labeled a neutral "accommodation," is not in fact neutral at all, and the Court is not allowed to defer to the mere characterization of RLUIPA as such. . . . When Congress acts to lift the limitations on one right while ignoring all others, it abandons a position of neutrality towards these rights, placing its power behind one system of belief. When the one system of belief protected is religious belief, Congress has violated the basic requirement of neutrality embodied in the Establishment Clause.

*Id.* at 576–77 (citations omitted).

As Justice O'Connor has explained, "Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Grumet*, 512 U.S. at 715, 114 S.Ct. 2481 (O'Connor, J., concurring). But under RLUIPA one's religion does affect one's rights and benefits. The Act's "compelling state interest test privileges religious [inmates] by giving them an ill-defined and potentially sweeping right to claim exemption from generally applicable laws, while comparably serious secular commitments . . . receive no such legal solicitude." Eisgruber & Sager, *supra*, at 453–54.

Simply labeling RLUIPA an "accommodation" statute does not change its effect. "Supreme Court decisions make clear that the constitutional power to accommodate religious practice does not license the state to confer privileges on religious believers indiscriminately." *Id.* at 453. For example, in *Caldor*, 472 U.S. at 708, 105 S.Ct. 2914, the Court struck down a Connecticut statute that "guarantee[d] every employee, who 'states that a particular day of the week is observed as his Sabbath,' the right not to work on his chosen day." The Court held that the statute violated the Establishment Clause because it "has a primary effect that impermissibly ad-

vances a particular religious practice." *Id.* at 710, 105 S.Ct. 2914. The Court emphasized the lack of exception to the statute:

In essence, the Connecticut statute imposes on employers and employees an absolute duty to conform their business practices to the particular religious practices of the employee by enforcing observance of the Sabbath the employee unilaterally designates. The State thus commands that Sabbath religious concerns automatically control over all secular interests at the workplace; the statute takes no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath. The employer and others must adjust their affairs to the command of the State whenever the statute is invoked by an employee.

*Id.* at 709, 105 S.Ct. 2914. Similarly, RLUIPA requires prisons to adjust their practices to accommodate religious practices whenever invoked by an inmate, unless a state interest of the highest order can be demonstrated.

*Amos* does not suggest a different result. In that case, the Court stated: "A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under Lemon, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." 483 U.S. at 337, 107 S.Ct. 2862. RLUIPA requires the government, *itself*, through the actions of prison administrators, to prefer religious rights over all others. *Madison*, 240 F.Supp.2d at 577 n. 9. Further, unlike the statute at issue in *Amos*, RLUIPA was not designed to remove a specific burden on the decision-making processes of religious organizations, or some other specific and peculiar disability imposed by a general law on a particular religious practice. Rather, it creates a broad-based right that religious inmates may invoke whenever

generally applicable prison rules impact their subjective religious beliefs.

As Judge Turk concluded:

The difference between *Amos* and RLUIPA is, like all Establishment Clause cases, a question of degree. However, the difference in degree between the two is substantial, and congressional neutrality is the line that divides them. When Congress has acted to impose an affirmative burden on religion, it is necessary for Congress to remove that burden in order to retain a position of neutrality towards religious belief. However, when Congress acts to provide religious inmates, and only religious inmates, with a level of constitutional protection that the Supreme Court has deemed unnecessary to protect religious rights, it has gone beyond protecting religion to affirmatively advancing it.

*Id.*

### ii. Burden and Effect on Non–Believers

Second, RLUIPA imposes a substantial burden on those it does not favor. While the Act will not levy monetary costs on non-believers, as, for example, a preferential tax exemption that shifts the tax burden to secular interests would, "a similar transfer will take place any time that government has a legitimate interest in denying an exemption." Eisgruber & Sager, *supra*, at 455. In a world of scarce resources for recreation, programming, and educational opportunities in prison, a statute that requires religious activities to receive primary consideration will obviously impact on the opportunities for non-religious inmates.

Moreover, when inmates see that the rules do not apply with the same force to the religious as to the agnostic or atheist, there will be two results. First, the latter group will feel angry and ostracized, which could lead to institutional safety and security concerns.[13] Second, non-religious prisoners will know what they have to do so that they, too, can benefit from the softer rules: become religious. Considering the meager resources and opportunities available to them inside prison walls, the compulsion to become religious—created by government—will indeed be strong.

### iii. Substantiality of the Burden Removed

The final consideration in evaluating accommodation or exemption statutes is the significance of the burden being removed. Ordinarily, this will be easy to define, as in *Amos*—religious employers were relieved of the burden of compliance with the religious discrimination component of Title VII. This was considered substantial in that it kept government out of the internal working of religious organizations.

But with RLUIPA, the burden to be removed is not specifically defined; rather, the Act extends to *all* substantial burdens on the religious exercise of inmates. As noted, this aspect of RLUIPA makes it unlike any accommodation statute approved by the Court. The sweeping scope of the Act is further demonstrated by its definition of "religious exercise"—"any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Therefore, Congress has required prison officials to accommodate religious practices with no real idea of what it was requiring be accommodated.[14] As Professors Eis-

---

**13.** Professors Eisgruber and Sager noted in their critique of RFRA that "by taking sides on theological questions, the government divides and disrupts the political community it ought to represent. This damage to the polity is not reducible to concerns about unfair subsidies and bruised feelings." Eisgruber and Sager, *supra*, at 457.

**14.** Gregory Walston, a California Deputy Attorney General, has noted that in the short

gruber and Sager have noted, a religious accommodation statute is defensible only if "it rests on a reasonable judgment that religious interests need a special protection because they are especially likely to be treated with hostility or indifference." Eisgruger & Sager, *supra*, at 460; *see also* William P. Marshall, *The Religious Freedom Restoration Act: Establishment, Equal Protection and Free Speech Concerns,* 56 Mon. L.Rev. 227, 241–42 (1995) ("RFRA lacks both the precision and the considered legislative judgment that might serve to sustain more limited government grants of exemption."). RLUIPA obviously fails the test.

Moreover, in order to harmonize *Turner's* admonition that courts defer to the reasoned judgment of prison administrators with application of RLUIPA's strict scrutiny standard, courts will inevitably soften that standard in order to sustain the actions of prison officials. *Madison,* 240 F.Supp.2d at 578 n. 10 (collecting cases where courts allowed speculative administrative judgments concerning security and cost to suffice as compelling state interests). This, in turn, "will almost certainly have the effect of diluting that test in other contexts [such as racial classifications] where the Court has found the test normatively apt and workable in application." Eisgruber & Sager, *supra,* at 452; *see also Smith,* 494 U.S. at 888, 110 S.Ct. 1595 (noting that application of the strict scrutiny standard to free exercise claims will "subvert its rigor in the other fields where it is applied").[15]

---

time RLUIPA has been effective "we have already seen Satan-worshiping inmates, as well as one inmate who made up his own religion with a Monday Sabbath so that he would be exempted from his Monday job duties, argue that they are entitled to special rights under RLUIPA." Gregory S. Walston, *Federalism and Federal Spending: Why the Religious Land Use and Institutionalized Persons Act of 2000 is Unconstitutional,* 23 U. Haw. L.Rev. 479, 480 (2001) (footnote omitted). While religion certainly has a treasured place in our society, Congress's apparent judgment in RFRA and RLUIPA that religious practice is an unalloyed good that should be allowed to trump other societal interests is questionable, at best. As Professor Marshall notes, "Free exercise claims do not always present a one-sided controversy where only one civil liberty interest is at stake." William P. Marshall, *The Religious Freedom Restoration Act: Establishment, Equal Protection and Free Speech Concerns,* 56 Mon. L.Rev. 227, 228 (1995). Religious groups and individuals have invoked their faith to justify discrimination on the basis of race, sexual orientation, and marital status. *Id.* "Under the RLUIPA, religious groups may even be able to challenge the imposition of fire, safety, and health regulations." Walsh, *supra,* at 197.

**15.** Eisgruber and Sager persuasively explain why strict scrutiny is inapt in analyzing free exercise claims:

The compelling interest test cannot bear the meaning in the area of religious exemptions that it has elsewhere. A ruthless presumption of invalidity is appropriate to racial classifications, which rarely have a sound justification. No such presumption can apply, however, to laws that burden religious conduct. Religious obligations can clash with the public interest in an infinite variety of ways and with infinite degrees of intensity. As we have elsewhere observed, religious belief need not be founded in reason, guided by reason, or governed in any way by the reasonable. Examples abound: religion may compel believers to withhold medical care from children, to ingest dangerous substances, to slaughter protected animal species, to refuse to pay taxes, to accumulate weapons, or to discriminate on the basis of race and gender. There is a substantial range of religiously motivated conduct—readily observable in contemporary national experience—that quite clearly must yield to conflicting secular laws.
No one seriously disputes this. · Even the staunchest promoters of the compelling state interest test in this context do not want it to be routinely fatal in fact when applied to laws burdening religious conduct.
*Id.* at 447 (internal quotation marks and footnotes omitted). Simply put, unlike race, "there is no constitutional justification for the privileging of religion." *Id.* at 448.

Finally, it is worth noting that if prison officials indeed behave arbitrarily or discriminatorily in denying religious freedoms (or other constitutional rights), which, according to Congress, RLUIPA was enacted to remedy, inmates already have a remedy under *Turner* and *O'Lone.* These decisions require that prison policies be "legitimate and neutral." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. Courts should not allow "frivolous or arbitrary rules" that burden religion, 146 Cong Rec. at S7775, even under the deferential standard that controlled prior to RLUIPA's enactment.[16]

### iv. Conclusion as to RLUIPA's Effect

■ Government may not, under the guise of accommodation, create incentives to undertake religious indoctrination or define the recipients of its assistance by religion. *See Agostini,* 521 U.S. at 231–32, 117 S.Ct. 1997; *see also Wallace,* 472 U.S. at 69, 105 S.Ct. 2479 (O'Connor, J., concurring) ("[T]he Establishment Clause is infringed when the government makes adherence to religion relevant to a person's standing in the political community."); *Welsh v. United States,* 398 U.S. 333, 356, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring) (stating that if government chooses to grant exemptions "it cannot draw the line between theistic or nontheistic religious beliefs on the one hand and secular beliefs on the other"). That is precisely the effect of RLUIPA.[17]

I therefore find that it violates the second prong of the *Lemon* test.

### c. Excessive Entanglement Under RLUIPA

In order to satisfy the third prong of the *Lemon* test, a statute must not foster an excessive entanglement of government with religion. *Lemon,* 403 U.S. at 613, 91 S.Ct. 2105. To determine whether a statute fosters excessive entanglement a court must examine "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." *Id.* at 615, 91 S.Ct. 2105.

■ RLUIPA also fails under this prong because it forces the states to become involved with, knowledgeable about, and exceedingly sensitive to the varied religious practices of their inmates. It also forces the federal courts to become involved in prison administration, an area that the Supreme Court has admonished judges to avoid.

A recent case in the Western District of Wisconsin suggests how both of these aspects of entanglement can occur. In *Charles v. Verhagen,* 220 F.Supp.2d 937, 940 (W.D.Wis.2002), an inmate claimed that a restriction on prayer oil violated his rights under RLUIPA and the Free Exercise Clause of the First Amendment. The

**16.** It is also worth noting that if Congress wished to outlaw religious discrimination in prisons it could easily have done so. *See* Walsh, *supra,* at 202–03. RLUIPA does not merely seek to prevent discrimination against smaller or disfavored religions; it grants an upper hand to all religions.

**17.** RLUIPA "does not simply favor religion; it clothes that favoritism in constitutional language and categories.... Congress has certainly cloaked religious interests with the prestigious symbols of constitutional privilege and done so in defiance of the Court's own

constitutional judgment." Eisgruber & Sager, *supra,* at 457–58; *see also* Walsh, *supra,* at 189 ("The RLUIPA favors and protects those with a system of religious beliefs over those who do not hold an organized view of religion."); *id.* at 196 n. 63 (quoting Ross K. Baker, *Commentary: Religious–Political Mix Makes a Bad Brew,* L.A. Times, Sept. 11, 2000, at B7) ("remarking that the RLUIPA is 'a bill that would cause James Madison and other authors of the Constitution who abominated government meddling in religion to gyrate in their crypts' ").

court held that the rule did not violate the plaintiff's First Amendment rights because it was reasonably related to the legitimate penological interest of limiting the quantity of personal possessions inmates could have in their cells. *Id.* at 953.

However, the court found that the regulation did violate RLUIPA. The defendants argued that it was necessary to put general limitations on inmate property, including religious property. *Id.* at 948. The court stated: "Even assuming that these security and administrative concerns are compelling governmental interests, I cannot find that defendants have employed the least restrictive means of furthering those interests." *Id.* Instead of banning the religious prayer oil outright, defendants could address the security and administrative burdens "at a lower cost to inmates' religious freedom by, for instance, capping the overall amount of property a prisoner may possess and forcing prisoners who desire spiritual items to sacrifice secular ones in exchange." *Id.* at 949.

And so, under RLUIPA, prison officials are placed in the business of counting the number of trinkets in each inmate's cell, dividing them into religious and non-religious stacks, then subtracting the surplus from the secular pile. While RLUIPA forces prison administrators and courts to make distinctions between religious and secular property, recall that the religious item need not even be "central" to the inmate's "system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Moreover, the prison official must, as an initial matter, determine whether the inmate practices a "religion," entitling him to heightened protection. The legal test for determining what is a "religion" looks primarily to the subjective views of the individual seeking protection.[18] *See Peterson v. Wilmur Communications, Inc.,* 205 F.Supp.2d 1014, 1018 (E.D.Wis.2002). Therefore, if

the inmate holds a "sincere" belief that occupies the same place in his life as an orthodox belief in God, *id.,* the prison official must pause before treating that inmate like any other. *See Madison,* 240 F.Supp.2d at 579 ("As a result of the broad interpretation given to 'religious exercise,' a court must abide by the individual prisoner's subjective determination that a particular practice is a method of religious belief."); *see also Rouser v. White,* 944 F.Supp. 1447, 1454 (E.D.Cal.1996) ("The Supreme Court has explained that the relevant question is not what others regard as an important religious practice, but what the plaintiff believes.").

Under RLUIPA, prison officials must also predict the future consequences of their actions regarding religion. Every time the prison seeks to enact a new rule, it must determine whether the rule will impose a substantial burden on at least the main religions. But that determination will not be conclusive, for RLUIPA protects religions and religious practices unknown to reasonable prison officials, including religions and religious practices not yet in existence. *See* Walsh, *supra,* at 193 (stating that under RLUIPA's broad definition of religious practice, a person could allege a substantial burden based on a system of beliefs government may not have known about and could not have foreseen).

If the inmate brings suit under RLUIPA, the court must engage in a similar analysis, second guessing the reasoned judgment of those expert in prison administration. As the Supreme Court recognized years ago, this entanglement is not only excessive, it is unworkable.

### d. Cases That Have Upheld RLUIPA and RFRA

I note that several other courts have upheld RLUIPA in the face of Establish-

---

**18.** Congress did not attempt to define "religion" in RLUIPA.

ment Clause challenges. With respect, I believe those decisions to be flawed.

Because these courts have employed basically the same reasoning, I will focus on the Ninth Circuit's recent decision in *Mayweathers*. In just three short paragraphs of analysis (one for each prong of the *Lemon* test), the court found that RLUIPA passed muster.

First, the court found, relying solely on *Amos*, that RLUIPA had a secular purpose—to protect the exercise of religion in prison. 314 F.3d at 1068. As noted above, this is a debatable issue but one that need not be resolved.

Second, the court held, again relying solely on *Amos*, that the primary effect of RLUIPA neither advances nor inhibits religion; instead it calls for the opposite, forbidding states from imposing burdens on religious worship. *Id.* at 1068–69. Of course, the Act does more than that. It requires correctional officials to prefer religion over irreligion in every aspect of prison administration. Unlike the statute at issue in *Amos*, and unlike all of the other accommodation statutes the Court has previously encountered, RLUIPA was based not on a specific legislative finding that a certain religious practice was impermissibly burdened by government; rather, it requires that all religious practice must be free from any burden not narrowly tailored to support a compelling interest.

Finally, the court held that RLUIPA does not foster excessive entanglement. The court noted that, on its face, the Act does not require "pervasive monitoring" to prevent the government from indoctrinating religion. *Id.* at 1069 (citing *Agostini*, 521 U.S. at 233, 117 S.Ct. 1997). But this is a straw man. The statute upheld in *Agostini* allowed public school teachers to go into parochial schools to provide remedial education to disadvantaged children, 521 U.S. at 208, 117 S.Ct. 1997, creating the possibility that state paid teachers conducting classes in a sectarian environment might manifest sympathy for religion to the point of using public dollars for the purpose of religious indoctrination, *id.* at 241–42, 117 S.Ct. 1997 (Souter, J., dissenting). There is admittedly no danger that RLUIPA will turn prison guards into preachers. Rather, by preferring religion to irreligion, the Act *itself* does the indoctrinating: if an inmate wants the increased protection afforded those proclaiming religious convictions he will convert.

The *Mayweathers* court next asserted, without any support, that "RLUIPA does not require prison officials to develop expertise on religious worship or to evaluate the merits of different religious practices or beliefs. The statute itself defines religious exercise . . . ." 314 F.3d at 1069. Of course, the Act defines "religious exercise" so broadly that even the most-learned theologian would be hard pressed to identify its contours. Moreover, any prison administrator seeking to avoid liability under the Act will seek to become knowledgeable concerning at least the main religions existing with the prison walls.

The Fifth Circuit's holding in *City of Boerne* that RFRA did not violate the Establishment Clause (to which the Seventh Circuit deferred in *Sasnett*) is equally unconvincing. Relying exclusively on *Amos*, the court there found that RFRA had a valid purpose of removing burdens on religious practice, and that its primary effect was not forbidden because it merely allowed the religious to practice and advance their faith. 73 F.3d at 1364. As discussed above, *Amos* does not provide the answer to whether RLUIPA violates the Establishment Clause. RLUIPA does more than allow religious inmates to practice freely; it provides them "with a legal weapon that no atheist or agnostic can

obtain." *City of Boerne*, 521 U.S. at 537, 117 S.Ct. 2157 (Stevens, J., concurring).

Finally, the United States directs my attention to *Cohen v. City of Des Plaines*, 8 F.3d 484, 487 (7th Cir.1993), where the court upheld against an Establishment Clause challenge an ordinance that exempted religious day care centers from certain zoning requirements. Adhering closely to the Court's rationale in *Amos*, the Seventh Circuit held that the City's "zoning ordinance has the secular purpose of minimizing governmental meddling in religious affairs." *Id.* at 491. The court found the ordinance did not have impermissible effects because allowing churches to provide child care and education services cohered with their religious missions, and the exemption did not require the general populace to subsidize religious organizations. *Id.* at 492. Nevertheless, recognizing that the ordinance might confer commercial benefits on churches, and following the concurring opinions of Justices Brennan and O'Connor in *Amos*, the court required that the religious day care centers covered by the ordinance be nonprofit. *Id.* at 493. Finally, the court found that rather than fostering entanglement, the ordinance effected more complete separation of church and state. *Id.*

For the same reasons that *Amos* does not control the outcome in the present case, neither does *Cohen*. The *Cohen* court realized that at times exemptions are required to *avoid* Establishment Clause entanglements. *See id.* at 490–91. RLUIPA does precisely the opposite—it fosters entanglement. Further, in *Cohen* the court held that the benefitted day care centers had to be not-for-profit in order to avoid creating a windfall for only some members of the relevant community. No similar limitation is apparent with RLUIPA; its benefits flow solely to the religious.

#### e. Conclusion as to RLUIPA's Constitutionality

RLUIPA violates the second and third prongs of the *Lemon* test because its primary effect is to advance religion, and because it fosters an excessive entanglement between government and religion. Therefore, I conclude that § 2000cc–1 of RLUIPA, which governs the claims of prison inmates, violates the Establishment Clause. Defendants' motion to dismiss plaintiff's claims under RLUIPA will, accordingly, be granted.

### II. FIRST AMENDMENT CLAIM OF DEPRIVATION OF INCENDIARY MATERIALS

Defendants next move to dismiss plaintiff's claim that his free exercise rights were violated by the deprivation of oil, incense, and candles, which defendants describe as "incendiary materials." Defendants contend that any restriction on such materials would be rationally related to legitimate penological interests, and therefore plaintiff fails to state a claim on which relief may be granted.

#### A. Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Dismissal of an action on such a motion is warranted only if the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir.1997). The essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts, it is that even assuming all of his facts are true, he has no legal claim. *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir.1999). In considering such a motion, the court must assume that all of

the facts alleged in the complaint are true and draw all reasonable inferences flowing from those facts in the light most favorable to the plaintiff. *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1326 (7th Cir.1990).

## B. Application of Standard to Plaintiff's Claim Regarding Incendiary Materials

In ruling on this motion, I first note that plaintiff's complaint was screened under 28 U.S.C. § 1915A and found to state a claim upon which relief may be granted. In the complaint, plaintiff alleged that the individual defendants discriminated against him based upon his religion and refused to accommodate his religious needs, and that the policies of the DOC authorized or failed to prevent such conduct.

However, defendants now ask me "to take judicial notice of the fact that oil, incense, and candles are incendiary materials, and to take judicial notice of the inherent dangers relating to the possibility of a fire in a correctional institution." (Defendants' Brief in Support of Motion to Dismiss at 18). Defendants also ask me to take judicial notice of the facts that incense and scented oils may be used to mask the odors of unlawful activities, such as the smoking of marijuana; that the burning of incense and candles will cause smoke to enter the air, and that smoke is an irritant for individuals with serious medical conditions such as asthma, bronchitis, or emphysema.

These concerns may indeed constitute legitimate penological interests, justifying restrictions on plaintiff's religious practices. However, it appears that defendants already allow at least some of these practices pursuant to DOC rules. Along with their reply brief, defendants attach a copy of the DOC's Internal Management Procedure # 6 (IMP–6), of which it also asks me to take judicial notice. (Defendants' Reply Brief in Support of Motion to Dismiss, Ex. B). IMP–6 contains a provision for "Smoking/Smudging/Incense" which states in part:

> Each institution will allow opportunities for ceremonial smoking, smudging and the use of incense consistent with its policy on use of smoking materials. Ceremonial smoking, smudging and the use of incense will be authorized as set forth by the institution in the Chapel or other designated areas (indoors and/or outdoors).

(*Id.,* Ex. B at 10–11).

 As noted above, a regulation that impacts on an inmate's constitutional right to free exercise of religion is valid if it is reasonably related to legitimate penological interests. *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400. To determine whether such a relationship exists, the court should consider (1) whether there is a logical connection between the restriction and the governmental interests invoked to justify it; (2) the availability of alternative means to exercise the restricted right; (3) the impact that accommodation of the right might have on other inmates, on prison personnel, and on allocation of prison resources generally; and (4) whether there are "obvious, easy alternatives" to the policy that could be adopted at *de minimis* cost. *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254.

Defendants argue that any regulation denying plaintiff access to incendiary materials would be reasonable. Yet IMP–6 permits access to and use of incendiary materials, at least under certain circumstances. On the state of this record, I cannot determine as a matter of law that defendants' actions regarding plaintiff's possession and use of such materials were reasonable. Therefore, the motion to dismiss will be denied.

## III. QUALIFIED IMMUNITY ON FIRST AMENDMENT CLAIMS

Finally, the individual defendants contend that they are entitled to qualified immunity on plaintiff's First Amendment claims relating to a kosher diet; the use of pots, pans, and utensils that may have come into contact with pork; refusal to recognition his legal (Muslim) name; and the use and possession of incendiary materials.

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir.2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Court held that the issue of qualified immunity is analyzed under a two step test. The threshold inquiry is whether "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged" show the official's conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. In the event that no constitutional right would have been violated if the allegations were established, there is no need for further analysis. *Id.*

 However, if a violation could be demonstrated based on a favorable view of the plaintiff's submissions, the analysis proceeds to the second step, which requires the court to determine whether the right was clearly established. *Id.* Such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted." *Id.* at 202, 121 S.Ct. 2151. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202, 121 S.Ct. 2151; *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law". However, if various courts have agreed that certain conduct is a constitutional violation under facts indistinguishable from those presented in the case before the court, the officer is not "entitled to qualified immunity based simply on the argument that courts have not agreed on one verbal formulation of the controlling standard." *Id.* at 202–03, 121 S.Ct. 2151.

The issue of qualified immunity is before me in the present case on a motion to dismiss. The Seventh Circuit has recently noted that:

> a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. *See Jacobs v. City of Chicago*, 215 F.3d 758, 765 n. 3 (7th Cir.2000). Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: "The plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Id.* As noted in *Jacobs'* concurrence, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal.... [W]hen defendants do assert immunity it is essential to consider facts in addition to those in the complaint." *Id.* at 775 (Easterbrook, J., concurring).

*Alvarado*, 267 F.3d at 651–52.

For two reasons I will deny the motion at this time. First, "[t]he principle that the determination of immunity need not be made at the earliest opportunity if a fuller

development of the record would be helpful to a sound decision is well established." *Hunafa v. Murphy*, 907 F.2d 46, 49 (7th Cir.1990) (collecting cases). Given the uncertainty in the record, and in light of the Seventh Circuit's admonition that it is almost never proper to dismiss a complaint under Rule 12(b)(6) on qualified immunity grounds, I will not dismiss plaintiff's claims on this basis.

Second, plaintiff is seeking injunctive relief as well monetary damages. Thus, a finding that the individual defendants are immune would not result in termination of this lawsuit. *Jacobs*, 215 F.3d at 774 (Easterbrook, J., concurring) (stating that qualified immunity defeats only a particular remedy, money damages, and that even if qualified immunity from damages is certain, the complaint may pass muster under Rule 12(b)(6)).

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that § 2000cc–1 of RLUIPA is declared unconstitutional, that defendants' motion to dismiss plaintiff's claims thereunder is **GRANTED**, and that plaintiff's RLUIPA claims are **DISMISSED**;

**IT IS FURTHER ORDERED** that the defendants' motion to dismiss is, in all other respects, **DENIED**.